**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

FABIA SCALI-WARNER,                     *

     *Plaintiff,*                              *

                                   Case No. 1:18-cv-01984-DKC

v.                                      *

N&TS GROUP CORPORATION,                 *

     *Defendants.*                            *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

       The Court is familiar with this case, having issued two Memorandum Opinions resolving two motions to dismiss iterations of Plaintiff's complaint pursuant to Rule 12(b)(6).  Because this is a motion for summary judgment, however, Plaintiff's unsupported claims that Defendant was her employer are no longer shielded from scrutiny by the Court's obligation to assume the truth of all her factual allegations. Rather, the Court's decision here must be based upon the evidence or the lack of thereof.  Here, the evidence shows that there is no dispute of material fact that (1) all of the work that Plaintiff alleges she performed was pursuant to two arm's length contracts with entities other than Defendant based upon instructions from employees and management acting on behalf of entities other than Defendant, (2) that all of the invoices she generated for her work were issued to entities other than Defendant and were paid by entities other than Defendant and (3) that Defendant was not involved in negotiating or controlling the terms of her work or pay. Thus, Defendant was not Plaintiff's employer pursuant to the applicable federal and state statutes and does not owe her pay for overtime or for her translation

work. Because "the depositions, answers to interrogatories, and admissions on file, together with

the affidavits … show that there is no genuine issue as to any material fact … [Defendant] is

entitled to a judgment as a matter of law." [1]

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

**I.   The Relevant Entities**

   **A.   Non-Party N&TS Group SPA**

1. N&TS SPA is an Italian corporation and has offices in Milan, Italy and London, England. *See* Ex. A, S. Federici Dec., at ¶2.

2. N&TS SPA develops software applications which allow businesses to process payments and transactions in multiple countries, languages, and currencies. *Id*. at ¶3.

3. Before Valerio Masanzani died in 2019, he was the Chief Executive Officer of N&TS SPA and Stefania Federici was its Chief Financial Officer. Since that time, Stefania Federici has been its CEO. *Id*. at ¶4.

4. The following other individuals with whom Plaintiff interacted during the relevant time period were officers of or employed by N&TS SPA in Milan, Italy: Laura Caputo, Marika Caputo, Matteo Masenzani, Daniela Cossio, Enrico Febelli, Serena de Biasi, Lorenza Dell'Angelo, and Laura Ginnatasio.  *See* Ex. C, Plaintiff's Dep., at 98-99, Ex. B, Plaintiff's Answers to Interrogatories, at No. 1 and 2.

5. Mauritzio Novebaci works for N&TS SPA in its London office. *See* Ex. B, Plaintiff's Dep., at 104.

   **B.   Non-Party American Payment Services/American Payment Processing**

6. American Payment Services Inc ("APS") was a Florida corporation with its principal place of business in Miami, Florida.  *See* Ex. D, Certified Corp. Docs.

7. APS was incorporated in Florida on May 21, 2014. *Id*.

8. APS changed its name to American Payment Processing Inc. ("APP") on August 25, 2015. *Id*.

---

[1] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

9.  APS was formed for the purpose of providing services in the United States similar to those provided by N&TS SPA in Europe. *See* Ex. E, Novebaci Dep., at 24.

10. APS was dissolved on June 2, 2017.  *See* Ex. E, Novebaci Dep., at 27, Ex. D, Certified Corp. Docs.

## C.  Defendant, N&TS Group Corporation

11. N&TS Group Corporation ("N&TS Corporation") was incorporated in Florida on June 16, 2015.  *See* Ex. F, Certified Articles of Incorporation.

12. The purpose of N&TS Corporation was to assist N&TS SPA, an Italian corporation, with its efforts to do business in America. *See* Ex.G, Novebaci Dec., at ¶3.

13. N&TS Corp. coexisted with APS for more than two years and thus was not a successor corporation to APS and did not exist as a result of APS changing its name. *See* Ex. E, Novebaci Dep., at 26-27.

14. Claudio Novebaci is a director of N&TS Corporation and its manager. *See* Ex. F, Certified Articles of Incorporation, Ex. E, Novebaci Dep., at 18, 38.

15. Mr. Novebaci is the sole individual involved in the day-to-day operations of N&TS Corporation. *See* Ex. G, Novebaci Dec. at ¶2.

16. Plaintiff has no personal knowledge of the actual corporate relationship of APS, N&TS Corporation and N&TS SPA. *See* Ex.B, Plaintiff's Dep., at 33.

17. N&TS Group Corp did not have any offices besides its location in Miami, Florida.  *See* Ex. G, Novebaci Dec., at ¶7.

18. N&TS Group Corp was not incorporated in Maryland during 2016, 2017, or 2018. *See* Ex. H, Plaintiff's Responses to RFAs, at No. 14.

## II.    Plaintiff's Education and Experience

19. Plaintiff has a degree in literature and philosophy and a master's degree in journalism and publishing from the Third University of Rome. *See* Ex. B, Plaintiff's Dep., at 7-8.

20. Plaintiff focused on social media and social media marketing when she studied journalism.  *Id.* at 8.

21. Plaintiff's experience expanded and she became more involved with account management, social media marketing, events and other online work. *Id.* at 8.

22. Plaintiff was employed in the 2011-2013 range by Delirium Editions to translate novels between English and Italian. *Id.* at 14-15.

23. Plaintiff was employed as a client liaison by Entando, a company with offices in San Diego and Italy and became familiar with N&TS SPA because it was a client of Entando. *Id.* at 11, 14, 17.

24. Alexander Orlando who worked with Plaintiff when she was with Entando referred her to Valerio Masenzani of N&TS SPA. *Id.* at 14.

### III.    The Formation of Viral Storytelling, Inc. and Its Contractual Relationship with APS and N&TS SPA

25. In January 2015, Plaintiff met with Valerio Masenzani of N&TS SPA at its offices in Milan to discuss a business relationship where Plaintiff would perform marketing work in the United States. *Id.* at 18-19.

26. Stefania Federici participated in the contract negotiations with Plaintiff for APS in 2015. *Id.* at 22.

27. Plaintiff was recruited because of her marketing experience and translating skills to market APS to grow its business in the United States.  *Id.* at 23.

28. Plaintiff was not hired to perform social media marketing, viral blogging or digital publishing. *Id.* at 10.

29. Plaintiff initiated the idea of a 1099 relationship/independent contractor status during her discussions with Valerio Masenzani. *Id.* at 19.

30. Plaintiff expressed her desire to remain free from being an employee with APS during discussions involving the 2015 contract. *Id.* at 19.

31. During her negotiations with Mr. Masanzani, there was no discussion of any restriction on Plaintiff doing work for other clients or any discussion of where Plaintiff was to do the consulting work, and Plaintiff did not believe that her ability to seek other clients was or could be restricted. *Id.* at 22-23, 26-27.

32. On January 15, 2015, Plaintiff formed a corporation, Viral Storytelling, Inc. *See* Ex. I, 01/15/2015 Articles of Inc. of Viral Storytelling.

33. She decided to form it as an "S" Corporation based upon the advice of someone she spoke with at SDAT. *See* Ex. B, Plaintiff's Dep., at 156.

34. According to Viral Storytelling's Articles of Incorporation, signed by Plaintiff, "the purposes for which [Viral Storytelling] is formed are as follows: Provide

marketing services and social media and viral blogging as well as digital publishing." *See* Ex. I, 01/15/2015 Articles of Inc. of Viral Storytelling.

35. In a July 24, 2015 email, Plaintiff explained, in detail, the reason for her decision to form Viral Storytelling as follows:

> I am currently collaborating with N&TS through my own company, Viral Storytelling, which I created for the sole purpose of working as a consultant. This is a day-based contract, considering a working day of 8 hours, which doesn't state the specific working hours and days since it's a consulting service.
>
> We agreed on this solution because I'm also working on other projects as well as on my own projects. Therefore, I need the freedom to allocate time to be able to work on these activities.

*See* Ex. J, 7/24/2015 Email from Plaintiff to L. Caputo and certified translation.

36. Viral Storytelling then entered into a February 3, 2015 contract with APS (the "APS Contract"). *See* Ex. K, 2/3/2015 APS Contract.

37. The relevant terms of the APS Contract were as follows:

### PREAMBLE

A) **Whereas**, the *Company* is active in the payment processing system's business.

B) **Whereas**, the *Company* wishes to develop its business in the United States and to this purpose needs the consultancy of a professional

C) **Whereas**, the *Company* wishes to engage the *Consultant* to provide certain consultant services listed in this Agreement

\*                              \*                              \*

### ARTICLE 3. Performance

3.1.   *Consultant* may perform its services at any location it deems necessary for the proper completion of the Project.

3.2.   All work performed under this Agreement shall be performed by *Consultant* or *Consultant's* qualified personnel

3.3.   The *Consultant* shall carry out its activity in complete autonomy, with full control on its work and on the performance of the same.

3.4.   *Consultant* shall report to the *Company* on the results and outcomes of *Consultant's* activities with relation to the Project

with feedbacks and directions throughout the development process.

**ARTICLE 4. Consultant's fee**

4.1.   The *Company* shall pay the *Consultant* a daily fee of $240 per day, based on 8 hours applied to the Project by the *Consultant* per day.

4.2.   *Company* shall reimburse the *Consultant* for those certain extraordinary travel expenses (flight, train, mileage, food and accommodation) in which *Consultant* may incur for the proper performance of its services under this Agreement and agreed upon by the *Company* and the *Consultant* prior to the *Consultant* incurring such expenses.

4.3.   The *Consultant* shall submit to the *Company* a monthly invoice detailing the services performed during the preceding month and the amount due. All such invoices shall be due and payable within 30 calendar days after receipt thereof by the *Company*.

\*                        \*
  \*

**ARTICLE 6. Independent Contractor Status**

6.1.   It is expressly understood that in the performance of the services herein provided, *Consultant* shall be, and is, an independent contractor, and is not an agent or employee of *Company*. *Consultant* has and shall retain the right to exercise full control over the employment, direction, compensation, and discharge of all persons assisting *Consultant* in the performance of the services rendered hereunder. *Consultant* shall be solely responsible for all matters relating to the payment, taxes, insurance of *Consultant's* employees, including but not limited to compliance with Social Security, withholding, and all other regulations governing such matters.

6.2.   The *Consultant*, maintains its full autonomy and freedom, without any subordination bonds.

**ARTICLE 7. Taxes**

7.1.   *Consultant* shall pay all taxes incurred while performing Services, including all applicable income taxes. Upon demand, *Consultant* shall provide *Company* with proof that such payments have been made.

*Id.*

38. The APS Contract did not restrict Viral Storytelling from seeking or working for other clients except those in competition with APS. *See* Ex. B, Plaintiff's Dep., at 22-23, 26-27, Ex. K, APS Contract at Article 9.

39. The APS Contract permitted Viral Storytelling to use qualified employees to perform the consulting services for APS. *Id.* at Article 3.

40. The APS contract did not require that Viral Storytelling work a specific number of days or hours per week or per year, nor did it specify that the work was to be performed during specific hours during the day.

41. Plaintiff's 2015 contract specified that Plaintiff had full control and autonomy over the performance of work. *Id.* at Article 3.

42. While the APS Contract required Viral Storytelling, Inc. to report on the results of its work and outcome of its activities, reports on a monthly or weekly basis were not required. *Id.* at Article 3.

43. ***There is no reference in the APS Contract to N&TS Group Corporation.***

44. Viral Storytelling sought, and Plaintiff performed work on behalf of Viral Storytelling outside of the APS Contract. *See* Ex. B, Plaintiff's Dep., at 108-110.

45. Viral Storytelling was required to submit a monthly invoice detailing the services performed and expenses incurred pursuant to the APS Contract. *See* Ex. K, APS Contract at Article 4.

46. The invoices submitted by Viral Storytelling for the work performed on behalf of APS (with two exceptions early on)[2], were submitted to N&TS SPA at its address in Milan and were paid by wire from its account in Italy to Viral Storytelling's account in the United States. *See* Ex. B, Plaintiff's Dep., at 171, Ex. A, Federici Dec., at ¶9.

47. Plaintiff performed the work required by the APS Contract from home and used her own computer and office supplies. *See* Ex. B, Plaintiff's Dep., at 51.

48. Plaintiff had access to use office space at a local Regus location on up to two days per month and could receive mail at the Regus location *See* Ex. B, Plaintiff's Dep., at 51-52, Ex. L, REGUS contract at 2.

---

[2] The first invoice submitted by Viral Storytelling was to APS and another was submitted to N&TS Invest. *See* Ex. B, Plaintiff's Dep. at 35, 171.  No invoice was ever submitted to Defendant and no invoice was ever paid by Defendant. See Ex. H, Plaintiff's Responses to RFAs at No. 23, Ex. E, Novebaci Dep., at 38-39.

49. Plaintiff performed her work during the relevant time frame pursuant to instructions from Stefania Federici, Laura Caputo and other N&TS SPA employees from Milan, Italy or London, England. *See* Ex. A, Federici Dec., at ¶10.

50. The APS Contract automatically renewed for an additional year on December 31, 2015.

51. Plaintiff did not report to anyone that she worked more than 40 hours per week, and never sent any documentation to anyone that she had worked overtime. *See* Ex. B, Plaintiff's Dep., at 133-135.

52. As part of her consulting work, Plaintiff used a business card. It identified her as working for "N&TS Group." It did not say N&TS Group *Corporation*. *See* E.C.F. No. 24-2. It showed that N&TS Group had locations in Milan, London and Baltimore. *Id*.

53. The banners and other materials that Plaintiff displayed at trade shows and conventions identified the booths she worked at as belonging to "N&TS Group." They did not say N&TS Group *Corporation*. *See* Ex. M, Photos produced by Plaintiff.

**IV.   Plaintiff's Contract with APS Ends and She Signs a Contract with N&TS Group SPA**

54. At the end of 2016, shortly before APS was dissolved, the APS Contract was terminated and Viral Storytelling, Inc. entered into a new contract with N&TS Group SPA (the "N&TS SPA Contract") which was signed by Stefania Federici in Milan, Italy on December 19, 2016. *See* E.C.F. No. 24-3 & Ex. N, Certified Translation of Contract.

55. ***There is no refence in the N&TS SPA Contract to N&TS Group Corporation.***

56. The N&TS SPA Contract included the following relevant terms:

   1.    ACTIVITY'S OBJECTIVE
   The activity covered by this contract will ***mainly concern***:

   U.S.A. market marketing development

   2.    ACTIVITY'S LOCATION

   The activities covered by this contract will be carried out at your location in Baltimore and, if necessary, at customer's site.

   3.    RATES

   The agreed daily rate for 8 working hours is $250/day

    4.     CONTRACT'S EFFECTIVE DATE AND DURATION

    The contract's effective date is 1/1/2017 with end on 31/12/2017

    The agreed total days are 200 in a year

*Id*. (Emphasis added).

57. The N&TS SPA Contract did not prohibit or preclude Viral Storytelling from performing work for other clients.

58. The N&TS SPA Contract did not dictate how many hours per week Plaintiff was required or expected to work, how much time Plaintiff spent on marketing and how much time she spent on translation work or when she was required to spend time on each.

59. During the course of the N&TS SPA Contract, Plaintiff negotiated an additional 20 days of paid work for 2017.  *See* Ex. B, Plaintiff's Dep., at 137-139.

60. Plaintiff filed a Schedule C (Form 1040) ("Profit or Loss from Business") as part of her 2017 Federal tax return. She did not report any wages or salary earned from Defendant on her 2016 or 2017 federal tax returns.  *See* Ex. O, Transcripts of Plaintiff's 2016-2017 tax returns, Ex. H, Plaintiff's Responses to RFAs at No. 12.

61. Plaintiff deducted use of her home for business purposes in her 2017 tax return. *See* Ex. O.

## V.    The Contractual Relationship Sours and is Terminated and Plaintiff Seeks Compensation for Translation Work

62. Because Viral Storytelling's marketing efforts were not successful, N&TS Group SPA requested that Plaintiff use the time that N&TS SPA was paying her for to do translation work. *See* Ex. A, Federici Dec. at ¶11.

63. There was no separate translation contract. *See* Ex. B, Plaintiff's Dep., at 81-82.

64. Plaintiff understood that translation work was included in the N&TS SPA Contract but believed that only translations that were to be used in the U.S. market were included. *Id*. at 91-92, 100-102, 111-113, 143).

65. Plaintiff submitted an invoice on behalf of Viral Storytelling to N&TS SPA for translation work that she believed was not being used for U.S. marketing and thus not included in the N&TS SPA contract.  *Id*. at 143-145.

66. N&TS SPA's position was that the N&TS SPA Contract was not limited to U.S. marketing because the contract said only that it "mainly concerned" U.S.

marketing.  Thus, the translation work should have been encompassed by the existing agreement.  *See* Ex. A, Federici Dec. at  ¶12.

67. There was an incident where Plaintiff and N&TS SPA could not agree on a travel itinerary for Plaintiff to a trade show in Las Vegas. *See* Ex. B, Plaintiff's Dep., at 65-66, 141-142.

68. Plaintiff refused to follow the itinerary requested by N&TS SPA because it did not comply with the terms of her contract. *Id*. at 65-66, 78-79, 140-141.

69. As a result of Plaintiff's refusal to attend, N&TS SPA hired a hostess to attend the trade show. *Id.* at 142.

70. Because of these types of disputes, and because N&TS SPA did not believe it was getting value from its contract with Viral Storytelling, it chose to terminate the contract in December 2017. *See* Ex. A, Federici Dec. at ¶13.

71. Following termination of the N&TS SPA Contract, Viral Storytelling continued to perform work for other clients. *See* Ex. B, Plaintiff's Dep., at 80-81.

## VI.    N&TS Group Corporation's Limited Involvement with Plaintiff

72. Claudio Novebaci works in Miami, Florida for N&TS Corporation.  *See* Ex. B, Plaintiff's Dep., at 28, 170, Ex. E, Novebaci Dep., at 63-64. The Miami office is N&TS Corporation's only location. *See* Ex. G, Novebaci Dec. at ¶7.

73. Mr. Novebaci is the only employee of N&TS Corp. *See* Ex. E, Novebaci Dep., at 40.

74. Mr. Novebaci was not involved in negotiating the APS Contract or the N&TS Group SPA Contract. *See* Ex. B, Plaintiff's Dep., at 76, Ex. E, Novebaci Dep., at 59, 65, Ex. G, Novebaci Dec., at ¶13.

75. Mr. Novebaci never instructed or supervised Plaintiff regarding her marketing work, did not assign Plaintiff translation and was not involved in setting her pay. *See* Ex. E, Novebaci Dep., at 71, 73, 92, Ex. B, Plaintiff's Dep., at 107.

76. Mr. Novebaci had no knowledge of Plaintiff's work hours or alleged overtime hours. *See* Ex. E, Novebaci Dep., at 71, 85, 107.

77. Plaintiff did not copy Mr. Novebaci on the reports she sent to Milan regarding her work. *See* Ex. B, Plaintiff's Dep., at 107.

78. Alexander Orlando, whom Plaintiff identified as working with her under the APS Contract, was not employed by or paid by N&TS Corporation. *See* Ex. E, Novebaci Dep., at 41, Ex. G, Novebaci Dec., at ¶8.

79. Rather, Mr. Orlando was employed by an American corporation that entered into a contract with N&TS SPA. *See* Ex. A, Federici Dec., at ¶15.

80. Plaintiff does not know who paid Mr. Orlando or whether he had a contract with any entity. *See* Ex. B, Plaintiff's Dep., at 28-30.

81. Other than Mr. Orlando and Mr. Novebaci no one was involved in Plaintiff's work in the United States. *Id*. at 29.

82. Plaintiff was never instructed by anyone at N&TS Group Corp to do any work. *See* Ex. E, Novebaci Dep., at 71.

83. No payments were ever made to Plaintiff by N&TS Group Corp. *Id.* at 38-39, 101.

84. Claudio Novebaci signed Non-Disclosure Agreements when Plaintiff received them from potential clients because potential clients wanted to deal with a U.S. company. *See* Ex. B, Plaintiff's Dep. at 71, 105, Ex. E, Novebaci Dep. at 51.

85. Plaintiff, as a consultant, was not authorized to sign documents on APS's or N&TS SPA's behalf. *See* Ex. A, Federici Dec., at ¶14.

86. Mr. Novebaci would pay invoices associated with Plaintiff's work because payment by an American company was required or because he had access to the credit card that N&TS SPA wanted to use to pay the expenses and Plaintiff was not given access to that card. *See* Ex. E, Novebaci Dep., at 46-48, Ex. B, Plaintiff's Dep. at 71.

87. On March 5, 2018, Plaintiff's counsel sent a demand letter to Defendant. Mr. Novebaci responded with a letter dated April 3, 2018, pointing out that Defendant was not Plaintiff's employer and had no commercial relationship with her or her corporation. *See* Ex. P, 4/3/2018 Letter.

## PROCEDURAL HISTORY

On or about April 18, 2018, Plaintiff filed a complaint against N&TS Group Corporation, Claudio Novebaci, Stefania Federici, and Valerio Masenzani in the Circuit Court for Baltimore County, styled *Fabia Scali-Warner v., N&TS Group Corporation et al.*, Case No. 03-C-18-003663. (E.C.F. No. 1-3).  Defendants removed the action to this Court on or about June 29, 2018 (E.C.F. No. 1.). After attempts by Plaintiff to file amended pleadings, and motions to

dismiss filed by Defendants, (detailed at pages 2-3 of E.C.F. No. 22 and p. 3 of E.C.F. No. 33), Plaintiff filed a Third Amended Complaint on April 1, 2019 (E.C. F. No. 24). The Third Amended Complaint included claims for violations Maryland Wage Payment & Collection Law ("MWPCL") against all Defendants (Count I), violation of the Fair Labor Standards Act ("FLSA") against all Defendants (Count II), Breach of Contract against N&TS Group Corporation (Count III) and violation of the Maryland Wage & Hour Law ('MWHL") against all Defendants (Count IV).

After briefing on Defendants' Motion to Dismiss the Third Amended Complaint, the Court issued a Memorandum Opinion and Order on March 10, 2020 granting in part and denying in part the Defendants' motion. (E.C.F. Nos. 33-34). Pursuant to the Court's decision, all of the claims against the individual Defendants and the minimum wage claims pursuant to the FLSA and MWHL were dismissed. Thus, the claims remaining are against N&TS Group Corporation only and consist of Plaintiff's claim, pursuant to the MWPCL that she was not paid for certain translation work, her claim that she was not paid overtime for her work as required by the FLSA and MWHL and her common law claim for Breach of Contract.

## LEGAL STANDARD

Under [Federal Rule of Civil Procedure] 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. To defeat the motion, the nonmoving party must submit evidence showing facts sufficient for a fair-minded jury to reasonably return a verdict for that party. *See Anderson v. Liberty*

*Lobby*, Inc., 477 U.S. 242, 252 (1986).

*Hailey v. Air & Liquid Sys. Corp.*, No. CV DKC 18-2590, 2020 WL 4732141, at *3 (D. Md. Aug. 14, 2020).

With regard to what law applies to Plaintiff's claims, although this case was removed to this Court based upon Federal Question jurisdiction (*see* E.C.F. No. 2), the Court is exercising supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state statutory (MWPCL, MWHL) and common law (breach of contract) claims. Thus, under the *Erie* Doctrine, Maryland law applies. *See*, *e.g.*, *Houben v. Telular Corp*. 309 F.3d 1028 1032 (7th Cir. 2002) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988)).

## <u>ARGUMENT</u>

### I.     Defendant was Not Plaintiff's Employer,  Thus, Defendant Does Not Owe Plaintiff Wages, Overtime or Compensation of Any Kind

It is undisputed that (1) Defendant was not a party to the contracts pursuant to which Plaintiff performed the work as alleged in the Complaint; (2) Defendant was not responsible for or involved in paying Viral Storytelling or Plaintiff for her work; and (3)  Defendant had no control over the work performed by Viral Storytelling or Plaintiff.  Accordingly, under controlling law, Defendant was not Plaintiff's employer for purposes of the FLSA or Maryland law and Defendant is entitled to summary judgment as to all of Plaintiff's statutory claims.

In order for Defendant to be liable for overtime under the FLSA (or the MWHL), Plaintiff must prove that she was "employed" by Defendant.  "Under the FLSA, an employee is 'any individual employed by an employer,' where 'employ' means 'to suffer or permit to work.'" *Braxton v. Eldorado Lounge, Inc.*, No. CV ELH-15-3661, 2017 WL 4865476, at *6 (D. Md. Oct. 27, 2017), *aff'd sub nom. Braxton v. Jackson*, 782 F. App'x 240 (4th Cir. 2019) (quoting 29

U.S.C. §§ 203(e)(1), (g)).  *See also McFeeley v. Jackson St. Entm't, LLC*, 47 F. Supp. 3d 260,

267 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir. 2016).

Plaintiff's entire claim against Defendant as articulated in the Complaint (the fourth

iteration of Plaintiff's claims) is premised upon Plaintiff's efforts to blur the lines between, on

one hand, Defendant, N&TS Group Corporation, a corporation  dually organized under the laws

of Florida and, on the other hand, American Payment Systems, Inc., a separate American

corporation and N&TS Group SPA, an Italian company, the two entities with which Plaintiff had

a contractual relationship.  While Plaintiff's self-serving allegations in the Complaint, that her

contracts were with Defendant, [3] may have been sufficient to allow her to avoid dismissal

because the Court was obligated to assume the truth of her allegations, now, with discovery

complete, the evidence shows that based upon the undisputed ***material*** facts, Defendant was not

Plaintiff's employer.  Those facts are as follows:

- On January 15, 2015, Plaintiff formed a corporation, Viral Storytelling, Inc. *See* Fact No. 32.[4]

- Plaintiff negotiated the terms of a consulting agreement with Valerio Masanzani in Milan, Italy on behalf of her corporation.  *See* Fact Nos. 25-26, 29-31.

- Viral Storytelling then entered into a February 3, 2015 contract with APS (the "APS Contract"). *See* Fact No. 36.

- The relevant terms of the APS Contract were as follows: *See* Fact No. 37.

**PREAMBLE**

D) **Whereas**, the *Company*[5] is active in the payment processing system's business.

---

[3] *See, e.g.*, "Mr. Masanzani negotiated the terms of the contract between N&TS and Plaintiff." (E.C.F. No. 24-1 at ¶3), "Plaintiff had at least two written marketing contracts during the time period, one in which N&TS is listed as the contracting or employing party (with its original corporate name  American Payment Services, APS)."  *Id*. at  ¶20.

[4] "Fact No.___" refers to the numbered paragraphs in Defendant's Statement of Undisputed material Facts at pages 2-11 above.

[5] In the APS Contract, "the Company" is defined as American Payment Systems, Inc.

E) **Whereas**, the *Company* wishes to develop its business in the United States and to this purpose needs the consultancy of a professional

F) **Whereas**, the *Company* wishes to engage the *Consultant* to provide certain consultant services listed in this Agreement

\*                              \*                              \*

## ARTICLE 3. Performance

3.1.    *Consultant* may perform its services at any location it deems necessary for the proper completion of the Project.

3.2.    All work performed under this Agreement shall be performed by *Consultant* or *Consultant's* qualified personnel

3.3.    The *Consultant* shall carry out its activity in complete autonomy, with full control on its work and on the performance of the same.

3.4.    *Consultant* shall report to the *Company* on the results and outcomes of *Consultant's* activities with relation to the Project with feedbacks and directions throughout the development process.

## ARTICLE 4. Consultant's fee

4.1.    The *Company* shall pay the *Consultant* a daily fee of $240 per day, based on 8 hours applied to the Project by the *Consultant* per day.

4.2.    *Company* shall reimburse the *Consultant* for those certain extraordinary travel expenses (flight, train, mileage, food and accommodation) in which *Consultant* may incur for the proper performance of its services under this Agreement and agreed upon by the *Company* and the *Consultant* prior to the *Consultant* incurring such expenses.

4.3.    The *Consultant* shall submit to the *Company* a monthly invoice detailing the services performed during the preceding month and the amount due. All such invoices shall be due and payable within 30 calendar days after receipt thereof by the *Company*.

- ***There is no reference in the APS Contract to N&TS Group Corporation.***

- The APS Contract automatically renewed for an additional year on December 31, 2015.

- At the end of 2016, shortly before APS was dissolved, the APS Contract was terminated and Viral Storytelling, Inc. entered into a new contract with N&TS Group

SPA (the "N&TS SPA Contract") which was signed by Stefania Federici in Milan, Italy on December 19, 2016. *See* Fact No. 54.[6]

- The N&TS SPA Contract included the following relevant terms (*See* Fact No. 56):

    5.   ACTIVITY'S OBJECTIVE
    The activity covered by this contract will ***mainly concern***:

    U.S.A. market marketing development

    6.   ACTIVITY'S LOCATION

    The activities covered by this contract will be carried out at your location in Baltimore and, if necessary, at customer's site.

    7.   RATES

    The agreed daily rate for 8 working hours is $250/day

    8.   CONTRACT'S EFFECTIVE DATE AND DURATION

    The contract's effective date is 1/1/2017 with end on 31/12/2017

    The agreed total days are 200 in a year

    *Id*. (Emphasis added).

- ***There is no refence in the N&TS SPA Contract to N&TS Group Corporation.***

- Claudio Novebaci works in Miami, Florida for N&TS Corporation.  *See* Fact No. 72.

- Mr. Novebaci is the only employee of N&TS Corporation. and the only person involved in its day-to-day operations. *See* Fact No. 73.

- Mr. Novebaci was not involved in negotiating the APS Contract or the N&TS Group SPA Contract. *See* Fact No. 74.

- Mr. Novebaci never instructed or supervised Plaintiff regarding her marketing work, did not assign Plaintiff translation and was not involved in setting her pay. *See* Fact No. 75.

- Mr. Novebaci had no knowledge of Plaintiff's work hours or overtime hours. *See* Fact No. 76.

- Plaintiff did not copy Mr. Novebaci on the reports she sent to Milan regarding her work. *See* Fact No. 77.

---

[6] Plaintiff alleged in the Complaint that this contract was with "N&TS," suggesting that it was with Defendant, and attached the contract which was in Italian with no translation. It was not. The contract was with N&TS SPA.

- Alexander Orlando, whom Plaintiff identified as working with her under the APS Contract, was not employed by or paid by N&TS Corporation. *See* Fact No. 78.

- Rather, Mr. Orlando was employed by an American corporation that entered into a contract with N&TS SPA. *See* Fact No. 79.

- Plaintiff concedes that she did not know who paid Mr. Orlando or whether he had a contract with any entity. *See* Fact No. 80.

- No payments were ever made to Viral Storytelling or Plaintiff by N&TS Group Corporation. *See* Fact No. 83.

- Claudio Novebaci's only involvement with Plaintiff while she was under contract with APS and N&TS Group SPA was that he signed Non-Disclosure Agreements when Plaintiff received them from potential clients because potential clients wanted to deal with a U.S. company, and Plaintiff, as a consultant, was not authorized to sign documents on APS's or N&TS SPA's behalf.  *See* Fact Nos. 84-85.

- Mr. Novebaci would pay certain vendor invoices associated with Plaintiff's work because payment by an American company was required or because he had access to the credit card that N&TS SPA wanted to use to pay the expenses and Plaintiff was not given access to that card. *See* Fact No. 86.

- Viral Storytelling was required to submit a monthly invoice detailing the services performed and expenses incurred pursuant to the APS Contract. *See* Fact No. 45.

- Neither Plaintiff nor Viral Storytelling ever submitted an invoice to N&TS Corporation. The invoices submitted by Viral Storytelling for the work performed by Plaintiff behalf of were submitted to N&TS SPA at its address in Milan and were paid by wire from its account in Italy to Viral Storytelling's account in the United States. *See* Fact No. 46.

- Plaintiff performed the work required by the APS Contract and the N&TS SPA Contract from home and used her own computer and office supplies. *See* Fact No. 47.

- Plaintiff did not report any wages or salary earned from Defendant on her 2016 or 2017 federal tax returns. *See* Fact No. 60.

- Plaintiff performed her work during the relevant time frame primarily pursuant to instructions from Stefania Federici, Laura Caputo and other N&TS SPA employees from Milan, Italy or London, England.  *See* Fact No. 49.

- Plaintiff did not report to anyone that she was worked more than 40 hours per week, and never sent any documentation to anyone that she had worked overtime. Fact No. 51.

- As part of her consulting work, Plaintiff used a business card. It identified her as working for "N&TS Group." It did not say N&TS Group **Corporation**. It showed that N&TS Group had locations in Milan, London and Baltimore. *See* Fact No. 52. N&TS Group Corporation (the Defendant) has a single location in Miami. *See* Fact No. 72.   N&TS Group SPA has locations in Milan and London. *See* Fact No. 1.

- The badges, banners and other materials that Plaintiff displayed at trade shows and conventions identified the booths she worked at as belonging to "N&TS Group." They did not say N&TS Group **Corporation**. *See* Fact No. 53.

These undisputed facts based upon evidence in the record demonstrate that Plaintiff negotiated two separate contracts that governed the work described in the Complaint and the pay Plaintiff received for that work and that neither contract was with Defendant.  It is likewise undisputed that Defendant did set the terms of Plaintiff's schedule or pay, did not assign or monitor Plaintiff's work and had no input into how or when she did her work. Also undisputed is that neither Plaintiff nor her corporation ever sought payment from Defendant, neither ever invoiced Defendant for her work, and neither ever received any payment from Defendant. Defendant was not involved in terminating her contracts.  Based upon these undisputed facts, Defendant was not Plaintiff's employer and is entitled to summary judgment as to Plaintiff's FLSA, MWPCL and MWHL claims.

## II.    Defendant Had No Knowledge of Plaintiff's Hours Worked

Defendant is entitled to summary judgment as to Plaintiff's overtime claim for another, separate reason. "In order to be liable for overtime wages under the FLSA, an employer must have 'knowledge, either actual or constructive of [that] overtime work.' " *Bailey v. Cnty. of Georgetown,* 94 F.3d 152, 157 (4th Cir.1996) (*quoting Davis v. Food Lion,* 792 F.2d 1274, 1276 (4th Cir.1986)). Thus, the burden is on [Plaintiff] to show that Defendant[] had knowledge, either actual or constructive, that [s]he was working unrecorded overtime hours. *Id.* Here, neither

18

contract that governed Plaintiff's work dictated how many hours per week Plaintiff was required

to work. *See* Fact Nos. 40, 58. It is undisputed that N&TS Group's sole employee, Claudio

Novebaci, was not involved in assigning Plaintiff marketing or translation work or supervising

Plaintiff and that he did not have knowledge of the hours she worked. *See* Fact Nos. 75-76.   Mr.

Novebaci's office was in Miami, Florida, while Plaintiff was working in her house in Towson,

Maryland See Fact Nos. 72, 47.  Thus, he could not have witnessed Plaintiff working for more

than 40 hours per week.  Plaintiff concedes that she never reported to anyone that she was

working more than 40 hours per week. *See* Fact No. 51. Furthermore, she did not copy Mr.

Novebaci on the reports she sent regarding her work. *See* Fact No. 77.  Thus, there would be no

way for Mr. Novebaci – and therefore no way for Defendant – to know that Plaintiff worked for

more than 40 hours in a work week.

### III.     Defendant Cannot Be Liable for Breach of Contract (Count III) Because None of the Work Performed by Plaintiff Was Pursuant to A Contract with Defendant.

Defendant is entitled to summary judgment as to Count III of the Complaint, for breach

of contract, because it is undisputed that Plaintiff never entered into a contract of any kind with

Defendant.  Thus, Defendant could not have breached a contract with Plaintiff. In Count III of

the Complaint, Plaintiff alleges that she entered into a contract with Defendant "for her labor and

services for translation work." *See* E.C.F. No. 24 at ¶41.  The only two contracts identified by

Plaintiff are the APS Contract and the N&TS SPA Contract. Defendant, N&TS Group

Corporation, is not a party to either of those agreements nor is it referenced anywhere in either of

those agreements. *See* Fact Nos. 36, 54-55. Plaintiff concedes that there was no separate

translation contract. *See* Fact No. 63.  Furthermore, N&TS Corporation never sent Plaintiff any

translation work to do. *See* Fact No. 75.

In order to prevail in a breach of contract claim, a plaintiff must prove  that there was a

contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant. *See RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 655, 994 A.2d 430, 440 (2010) (quoting *Continental Masonry Co., Inc. v. Verdel Constr. Co., Inc.,* 279 Md. 476, 480, 369 A.2d 566, 569 (1977) (emphasis in original)). *See also Lathan v. Sternberg*, No. 0988 SEPT.TERM 2014, 2015 WL 6125427, at *4 (Md. Ct. Spec. App. Sept. 30, 2015) ("To reiterate what is critical to the success of Ms. Lathan's claim—'a plaintiff must prove *that the defendant owed the plaintiff a contractual obligation* and that the defendant breached that obligation.'" (emphasis in original) (quoting *Taylor v. NationsBank, N.A.,* 365 Md. 166, 175 (2001)); *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012). Because Plaintiff never entered into any contract with Defendant, Defendant cannot be liable to Plaintiff for breach of contract. Accordingly, summary judgment as to Count III is warranted.

## IV.   Because Defendant's Conduct was Not Willful, Any Statutory Recovery by Plaintiff Should Be Limited to The Two Years Prior to When She Filed her Complaint

Even assuming, arguendo, that the Court denied Defendant's motion for summary judgment as to Plaintiff's claims in their entirety, Plaintiff's period of recovery for unpaid overtime should be limited to two years because Plaintiff neither alleged nor can prove that Defendant's conduct was willful. "The normal statute of limitations under the FLSA is two years, and only extends to three years where the plaintiff proves that a defendant's violation of the FLSA was willful. 29 U.S.C. § 255(a)." *See Cummins v. Ascellon Corp.*, No. CV DKC 19-2953, 2020 WL 6544822, at *8 (D. Md. Nov. 6, 2020).

> In 1988, the Supreme Court of the United States addressed the meaning of willfulness under Section 255(a) of the FLSA. In *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), the Court held that in order to show willfulness, a plaintiff must show that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *Id.* at 133, 108 S.Ct. 1677. Mere

negligence on the part of the employer with regard to compliance with
the FLSA is not sufficient to prove willfulness. *Id.*

*Gionfriddo v. Jason Zink*, LLC, 769 F. Supp. 2d 880, 890 (D. Md. 2011). Furthermore,

> Negligent conduct is not enough to constitute "willful" conduct. *See*
> *id.* "Although this is ultimately a question of fact, a plaintiff must present
> sufficient evidence of willfulness to survive summary judgment." *Hantz v.*
> *Prospect Mortg., LLC,* 11 F.Supp.3d 612, 617 (E.D.Va.2014) (citing *Pignataro v.*
> *Port Authority of New York and New Jersey,* 593 F.3d 265, 273 (3d
> Cir.2010)). Typically, willfulness is found when the defendant has already
> investigated for an FLSA violation or when there is evidence that the defendant
> tried to cover-up an FLSA violation. *Williams v. Maryland Office Relocators,* 485
> F.Supp.2d 616, 621 (D.Md.2007).

*Randolph v. PowerComm Const., Inc.*, 309 F.R.D. 349, 364 (D. Md. 2015).  Here, Plaintiff did

not allege in the Complaint that Defendant's conduct in failing to pay overtime was willful, nor

is there any evidence in the record that Defendant was previously investigated for an FLSA

violation or that Defendant tried to cover up an FLSA violation.  To the contrary, the evidence in

the record supports a reasonable conclusion that, at her own request and for her own benefit,

Plaintiff's corporation and APS and N&TS SPA entered into an independent contractor

relationship.

The sole allegation in the Complaint that can potentially be read to suggest willful

conduct appears in Paragraph 11 where Plaintiff alleges, in speculative and conclusory fashion

that, "[i]t appears that Defendants required the written contract with the limited liability company

set up by Plaintiff as a means to avoid Maryland employment laws."  *See* E.C.F. No. 24 at ¶11.

The evidence demonstrates that the opposite is true.  First, it was at Plaintiff's request that

Plaintiff's relationship with APS and N&TS SPA's relationship was that of an independent

contractor. *See* Fact No. 29.  Second, Stefania Federici, who was, at all relevant times, located in

Milan, Italy, negotiated the relevant contracts with Plaintiff, states unequivocally in her

declaration that Plaintiff requested that she work as an independent contractor and that she

"never discussed with [Plaintiff] any connection between her independent contractor status and American or Maryland overtime laws, nor do I have any knowledge regarding that issue." *See* Ex. A, Federici Dec. at ¶7.   Thus, there is no basis upon which to conclude that Plaintiff not being paid overtime was the result of willful conduct on the part of Defendant.

## V.        Plaintiff Should Not Be Permitted to Recover Any Enhanced Damages

Plaintiff is not entitled to liquidated damages under the FLSA or treble damages under Maryland law. To avoid liability for liquidated damages, Defendant must prove that the nonpayment "was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standard Act of 1938." *See Bowen v. Athelas Inst., Inc.*, No. DLB-19-2628, 2020 WL 4471517, at *2 (D. Md. Aug. 4, 2020) (quoting 29 U.S.C. § 260). For plaintiff to be awarded treble damages, she would need to establish that the failure to pay the wages was "not as a result of a *bona fide* dispute." *Id.* (quoting Md. Code Ann., Lab. & Empl. § 3-507.2(b).

Here, Defendant did not have a contract with Plaintiff and was not involved in any way with Plaintiff's work or pay. Thus, Defendant had a good faith basis for believing that it was not violating the FLSA at any relevant time.  The record demonstrates that even APS and N&TS Group SPA acted in good faith by entering into a contract with Plaintiff's corporation and treating her as an independent contractor at Plaintiff's own request and with no objection from Plaintiff until the business relationship was over, when Plaintiff claimed for the first time that she was an employee and entitled to overtime.

Plaintiff is also not entitled to treble damages as Defendant's liability *vel non* to Plaintiff for unpaid overtime is the result of a bona fide dispute because Defendant did not have a contract with Plaintiff and was not involved in any way with Plaintiff's work or pay . Furthermore,

Plaintiff has failed to allege and "did not offer any evidence of consequential damages suffered because of the underpayments." *See Castillo v. D & P Prof'l Servs., Inc.*, No. CIV.A. DKC 14-1992, 2015 WL 4068531, at *6 (D. Md. July 2, 2015) (quoting *Lopez v. Laws 'R' Us,* Civ. No. DKC–07–2979, 2008 WL 2227353, at *3 (D.Md. May 23, 2008)).

## **CONCLUSION**

For all of the foregoing reasons, Defendant respectfully submits that summary judgment should be entered in its favor and against Plaintiff on all Counts of Plaintiff's Third Amended Complaint.

Dated: December 7, 2020                     Respectfully submitted,

                                            _____/s/_____
                                            Joseph B. Wolf (Fed. Bar No. 27882)
                                              joseph@luchanskylaw.com
                                            Bruce M. Luchansky (Fed. Bar No. 08439)
                                              lucky@luchanskylaw.com
                                            **LUCHANSKY LAW**
                                            606 Bosley Avenue, Suite 3B
                                            Towson, Maryland 21204
                                            Telephone: (410) 522-1020
                                            *Attorneys for Defendant N&TS Group Corporation*

## CERTIFICATE OF SERVICE

I, hereby, certify that on December 7, 2020, a copy of the foregoing was served via the United States District Court for the District of Maryland's electronic filing system upon all counsel of record registered to receive such notifications.

\_\_\_\_\_/s/_____
Joseph B. Wolf