IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | : | |
| FABIA SCALI-WARNER, | | |
| | : | |
| v. | : | Civil Action No. DKC 18-1984 |
| | : | |
| N&TS GROUP CORPORATION | | |
| | : | |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment case is a motion for summary judgment filed by Defendant N&TS Group, Corporation ("N&TS Group").  (ECF No. 42).  The court now rules, no hearing deemed necessary.  Local Rule 105.6.  For the following reasons, Defendant's motion for summary judgment will be granted.

## I.   Factual Background

At the heart of this case is whether N&TS Group is Fabia Scali-Warner's ("Plaintiff") employer.  Thus, an understanding of the facts requires a basic understanding of three corporate entities, the interplay among them, and their interactions or lack thereof with Plaintiff.

Networks & Transactional Systems Group SPA ("N&TS SPA") is an Italian corporation based in Milan that provides businesses with software for use in processing electronic payments.  Prior to his death in 2019, Valerio Masenzani served as Chief Executive Officer

("CEO") of N&TS SPA, and Stefania Federici served as Chief Financial Officer ("CFO").   Upon Mr. Masenzani's death, Ms. Federici took over as CEO.   N&TS SPA also employed Laura Caputo and Daniela Cossio in Milan.   Mr. Alexander Orlando served as a managing director of N&TS SPA.   Each of these individuals supervised Plaintiff's work.

American Payment Services, Inc. ("APS"), was a Florida corporation.   It was formed in May 2014 for the purpose of providing services in the United States similar to those provided by N&TS SPA in Europe.   Ms. Federici served on the board of directors of APS.   The company was owned by Nets Invest Srl.   APS was dissolved three years after its formation on June 2, 2017.

N&TS Group is a Florida corporation formed on June 16, 2015 to assist N&TS SPA with its efforts to do business in the United States.   Claudio Novebaci served as the incorporator as well as the Director, President, Secretary, and Treasurer of the company. On July 31, 2015, the company's articles of incorporation were amended to name Mr. Novebaci as Director and Vice President, Ms. Federici as President and Director, and Mr. Masenzani as Director and CEO.   N&TS Group is owned by N&TS Invest Srl.[1]   (ECF No. 42-7, at 27).

---

[1] While all references in the written transcript of Mr. Novebaci's deposition are to "NETS Invest Srl," "NETS Group Corporation," and "NETS Invest SPA," the court assumes that this spelling NETS vs. N&TS seems to be a minor error made by the court

Ms. Scali-Warner was previously working at a company called Entando.  Plaintiff became familiar with N&TS SPA because it was one of Entando's clients.  One of Plaintiff's co-workers at Entando, Alexander Orlando, referred her directly to Mr. Masenzani.  In January 2015, Plaintiff met with Mr. Masenzani in Milan to discuss the possibility of entering into a business relationship.[2]  On January 15, 2015, Plaintiff formed Viral Storytelling, Inc. ("Viral Storytelling"), a corporation formed to "provide marketing services and social media and viral blogging as well as digital publishing."  (ECF No. 42-11, at 3).

On February 3, 2015, Viral Storytelling entered into a contract with APS to provide marketing services to help grow APS's presence in the U.S.  Plaintiff negotiated this contract with Ms. Federici although it was signed by Mr. Novebaci.  (ECF No. 42-9, at ¶ 13).  Invoices for work Plaintiff performed under the APS

---

reporter given the virtual nature of the deposition.  Mr. Novebaci was likely referring to "N&TS Invest Srl," "N&TS Group Corporation," and "N&TS Invest SPA" in each of his responses.

[2] The parties dispute whether Mr. Orlando was an employee of N&TS Group, N&TS SPA, or neither.  Mr. Orlando states that around January 2015, he began working for N&TS Group as the general manager of operations.  (ECF No. 45-4, at 1).  Mr. Novebaci and Ms. Federici, however, disagree.  Mr. Novebaci states that Mr. Orlando was neither employed by nor paid by N&TS Group, (ECF No. 42-9, at ¶ 8), and Ms. Federici states that he was employed by an American company that had a contract with N&TS SPA.  Plaintiff states both that Mr. Orlando was hired as general manager at N&TS Group in January 2015 to supervise her but also that she does not know who he was paid by or whether he had a contract.  (ECF No. 42-4, at 28-30).

contract were submitted to N&TS SPA in Milan and were paid by wire from N&TS SPA's Italian bank account. On December 31, 2015, the APS contract automatically renewed for another year. Plaintiff's contract with APS terminated at the end of 2016 shortly before APS dissolved.

Plaintiff then met with Mr. Masenzani again in Milan and negotiated a contract between Viral Storytelling and N&TS SPA "mainly concerning" U.S. marketing. (ECF No. 42-16). N&TS Group was not mentioned anywhere in the contract. The contract was signed on behalf of N&TS SPA by Ms. Federici on December 19, 2016. The contract term spanned one-year from January 1, 2017, through December 31, 2017. During this time period, Plaintiff performed both marketing and translation work. All work performed by Plaintiff during this period was done based on instructions received from N&TS SPA employees sitting in Milan or London, including Stefania Federici, Laura Caputo, and Daniela Cossio. (ECF No. 42-1, at 2). N&TS SPA chose not to renew its contract with Viral Storytelling when it expired in December 2017.[3]

---

[3] Defendant, N&TS Group, contends that it had limited involvement with Plaintiff. The parties agree that Mr. Claudio Novebaci never instructed or supervised Plaintiff's work and performed only administrative functions. Mr. Novebaci's sole involvement with Plaintiff was as follows: he would sign non-disclosure agreements when Plaintiff's potential clients desired to deal with a U.S. company, and he would pay invoices associated with Plaintiff's work because he had access to the credit card that N&TS SPA used for such expenses.

## II.  Procedural Background

On April 18, 2018, Plaintiff filed a complaint against N&TS Group, Claudio Novebaci, Stefania Federici, and Valerio Masenzani in the Circuit Court for Baltimore County, (ECF No. 1-3), and these defendants removed the action to federal court.  (ECF No. 1). Following multiple rounds of amended pleadings and motions to dismiss, Plaintiff filed a third amended complaint on April 1, 2019 asserting four claims: (1) violation of the Maryland Wage Payment and Collection Law ("MWPCL") (Count I); (2) violation of the Fair Labor Standards Act ("FLSA") (Count II); breach of contract (Count III); and violation of the Maryland Wage and Hour Law ("MWHL") (Count IV).[4]  (ECF No. 24).  On March 10, 2020, this court dismissed individual defendants Stefania Federici, Valerio Masenzani, and Claudio Novebaci and Plaintiff's minimum wage claims under the FLSA and the MWHL.  (ECF No. 34).  Discovery commenced and was extended until November 13, 2020.  On December 7, 2021, Defendant filed the presently pending motion for summary judgment. (ECF No. 42).  On January 21, 2021, Plaintiff responded in opposition.  (ECF No. 45).  Defendant replied on February 22, 2021.  (ECF No. 50).

---

[4] Plaintiff asserts both minimum wage and overtime violations under the FLSA and MWHL.

### III. Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.,* at 249. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Chung Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001).

To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact. No genuine dispute of material fact exists, however, if the nonmoving party fails to make a

sufficient showing on an essential element of his case as to which
he would have the burden of proof. *Celotex*, 477 U.S. at 322–23.
Therefore, on those issues on which the nonmoving party has the
burden of proof, it is her responsibility to confront the summary
judgment motion with an "affidavit or other evidentiary showing"
demonstrating that there is a genuine issue for trial. *See Ross
v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546
(4th Cir. 2014). Hearsay statements or conclusory statements with
no evidentiary basis cannot support or defeat a motion for summary
judgment. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157
v. City of Greensboro,* 64 F.3d 962, 967 (4th Cir. 1995).

**IV.  Analysis**

**A.    Statutory Claims: FLSA, MWHL, and MWPCL**

N&TS Group argues it is entitled to summary judgment on
Plaintiff's statutory claims in Counts I, II, and IV because
Plaintiff has produced no evidence that would allow a reasonable
juror to find that it was her employer. Because it was not her
employer, N&TS Group argues it does not owe her any wages,
overtime, or compensation of any kind. Plaintiff responds that
N&TS Group was, in fact, her employer but that even if it was not,
it is still liable to her for the alleged violations of law as a
joint-employer with N&TS SPA, as a single-employer enterprise with

N&TS SPA, or as a successor to APS.[5]  The court will address each of these arguments in turn.

### 1.  Individual Employer Liability

Neither party contends that a typical, written contract existed directly between Plaintiff and N&TS Group that would give rise to a direct employer relationship.  The parties agree that the only written contracts in existence were Viral Storytelling's contracts with APS and then with N&TS Group SPA.  (*See* ECF No. 45, at 2).  Plaintiff cites to *Campusano v. Lusitano Constr. LLC*, 208 Md.App. 29, 39-40 (Md.App. 2012) to argue that N&TS Group was her direct employer under the economic realities test.  The economic realities test considers whether the alleged employer had functional control by considering whether it: (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.

---

[5] Plaintiff raises her theories of joint-employer, single-employer enterprise, and successor liability for the first time in her opposition to Defendant's motion for summary judgment. Defendant argues that it is too late for Plaintiff to raise these alternate theories of liability because doing so serves as a constructive amendment to her complaint.  (ECF No. 50, at 4-6). While this may be true, the court notes that until this point, Defendant defended against this suit on the ground that Plaintiff was an independent contractor rather than an employee, rather than on the ground that it was not her proper employer.  Thus, the court will analyze Plaintiff's arguments of alternative liability.

*Id.* In a confusing turn of events, however, Plaintiff subsequently makes statements that directly refute this argument.

Rather than pointing to any evidence that N&TS Group exercised the power hire or fire her or control her work schedule or pay, Plaintiff actually repeatedly asserts the opposite. She twice states that "Federici, Masenzani, and Caputo controlled [her] work" and blatantly that "these three individuals had the four powers of the [economic realities] test set forth above." (ECF No. 45, at 14). Plaintiff testified that she was hired by Mr. Masenzani, CEO of N&TS SPA, (ECF No. 45-1, at 2), and that her pay was determined by its CFO, Ms. Federici. She also testified that she submitted requests for pay approval and payment to Ms. Federici, that she maintained all of her employment records, and had the power to modify her schedule, and did so, for example, by reducing Plaintiff's work to part-time status. (*Id.*, at 3). Plaintiff's plain concessions that N&TS SPA and its officers and employees exercised all functional control over her work is fatal to her claim that *N&TS Group* was her direct employer by virtue of the economic realities test. Plaintiff has failed to point to any evidence sufficient to create a genuine question that N&TS Group was her direct employer.

## 2. Joint Employer Liability

Plaintiff contends that even if N&TS Group SPA is considered her direct employer, N&TS Group is liable as a joint employer.

For N&TS Group to be liable under the FLSA, Plaintiff must prove that she was N&TS Group's employee, as that term is used for purposes of the FLSA. *See Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017) (citing 29 U.S.C §§ 203(e)(1), 206(a), 207(a)(1)).   In "joint employment" situations, all employers "are responsible, both individually and jointly, for compliance" with the FLSA.  29 C.F.R. § 791.2(a).  In *Salinas*, the Fourth Circuit developed a six-factor test to be used when analyzing whether an alleged employer is a "joint employer" for purposes of the FLSA.  The Fourth Circuit held, in the context of reviewing a summary judgment case, that courts should consider:

> (1)  Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;
>
> (2)  Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;
>
> (3) The degree of permanency and duration of the relationship between the putative joint employers;
>
> (4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;
>
> (5) Whether the work is performed on a premises owned or controlled by one or more of

10

the putative joint employers, independently or in connection with one another; and

(6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Id.* at 141-42. The absence of any one factor, or even a majority of factors, is not dispositive as to whether a joint employment relationship exists. *See Hall v. DIRECTV, LLC*, 846 F.3d 757, 770 (4th Cir. 2017). "[T]he fundamental question guiding the joint employment analysis is whether two or more [] entities are not completely disassociated with respect to a worker such that the persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment." *Id.* at 769 (internal quotations omitted).[6]

---

[6] Defendant contends that the *Salinas* factors for joint-employment are irrelevant here because there are only two scenarios in which a joint-employment relationship can be found to exist under Department of Labor Regulations, and neither are applicable here.

There are two joint employer scenarios under the FLSA.
(a)(1) In the first joint employer scenario, the employee has an employer who suffers, permits, or otherwise employs the employee to work, *see* 29 U.S.C. 203(e)(1), (g), but another person simultaneously benefits from

11

Here, the first factor, shared control or supervision over
the work, weighs heavily against finding a joint employment
relationship.  This is because rather than asserting that N&TS SPA
and Defendant *shared* control, Plaintiff asserts that, "the
entities had the *same* controlling persons supervising [her]
directly, with the exception of Orlando who worked only for [N&TS
Group]."[7]  (ECF No. 45, at 15).  Plaintiff alleges that the

_____

> that work.  The other person is the employee's
> joint employer only if that person is acting
> directly or indirectly in the interest of the
> employer in relation to the employee.
> . . . .
> (e)(1) In the second joint employer scenario,
> one employer employs a worker for one set of
> hours in a workweek, and another employer
> employs the same worker for a separate set of
> hours in the same workweek. The jobs and the
> hours worked for each employer are separate,
> but if the employers are joint employers, both
> employers are jointly and severally liable for
> all of the hours the employee worked for them
> in the workweek.

29 C.F.R. § 791.2.  The court will analyze Plaintiff's argument on
the merits because Plaintiff, albeit unartfully, seemingly argues
that the first joint employer scenario applies here because the
entities were under common control.

[7] Plaintiff contradicts herself a number of times with respect
to Mr. Orlando's role.  First, she simultaneously contends that
Mr. Orlando was employed as managing director of N&TS Group (Pl
Dep. at 28), yet also that he "had no written contract with any of
the N&TS entities," "was paid by N&TS SPA," and was "considered []
as an independent contractor" and asked "numerous times that he be
treated as an employee."  (ECF No. 45, at 7-8).  Likewise, she
claims that Orlando directed her work but also that he "was
supposed to be [her] supervisor [but] . . . [t]he Operators, Laura
Caputo in particular, supervised Plaintiff directly."  (ECF No.
45, at 3, 8).

"controlling persons" included Valerio Masenzani, Laura Caputo, Stefania Federici, and Alexander Orlando. (ECF No. 24, at 1).

As to the second factor, control over hiring and firing, Plaintiff concedes that it was N&TS SPA CEO, Valerio Masenzani, who exercised authority over her hiring. (ECF No. 45, at 2-3) ("Masenzani . . . hired Plaintiff for the position. [] Masenzani negotiated with Plaintiff the terms of Plaintiff's contract, and had the authority to and did in fact approve the negotiated terms of the contract and Plaintiff's working conditions and assignments."). N&TS Group also could not possibly have exercised control over Plaintiff's hiring with APS as it was not yet in existence at the time Plaintiff was hired. (ECF Nos. 42-8 & 42-13). There is no evidence that anyone at N&TS Group had the power to modify Plaintiff's employment arrangement; in fact, Plaintiff testified that Ms. Federici solely held the power to modify her work arrangement and exercised such power when she decided to change Plaintiff from full-time to part-time status. Thus, the second factor weighs against finding a joint-employment relationship.

As to the third factor, the degree of permanency and duration of the relationship between the putative joint employers, Plaintiff states, without citing to any evidence as support, that the "entities have a permanent relationship in that [N&TS Group] is the United States operation of N&TS Group Spa." (ECF No. 45,

at 16).  This conclusion ignores that N&TS SPA operated for years before N&TS Group was created in June 2015.[8]  Hence, the duration of association between the entities is not entirely consistent with joint employment.

The fourth factor is whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer.  Plaintiff states that this factor cuts in her favor because "there is common control of the entities."  There are two flaws with this conclusory assertion. First, Plaintiff conflates common control with the association of two entities.  Plaintiff relies solely on Mr. Novebaci's testimony that N&TS Group was owned by a single shareholder-N&TS Invest SRL-which in turn was owned by N&TS Invests SPA.  Mr. Novebaci stated he did not know who owned N&TS Invests SPA but that Ms. Federici, Ms. Caputo, and Ms. Cossio were officers of N&TS Invests.  This fact demonstrates, at most, a relationship between N&TS SPA and N&TS Group, but not definitive common ownership.  The second flaw is that despite the formal ownership structures, Plaintiff's argument is replete with assertions that there was no common control between the entities.   Instead, Plaintiff repeatedly

---

[8] While the record does not state exactly when N&TS SPA was formed, Mr. Novebaci testified that he first became involved with the organization around 2010 or 2011. (ECF No. 42-7, at 24).

argues that *all* control over *both* entities, was exercised *solely*

by N&TS SPA employees:

- "Defendant, through Masenzani, Caputo, Federici, and Orlando requested the specific tasks that Plaintiff performed for both marketing and translation, including the creation of documents, participation in conference calls, and determinations as to how Plaintiff was to respond to inquiries from customers and prospective customers. *Id.* ¶ 5.  Caputo dictated to Plaintiff the electronic mail message that Plaintiff was to send to Defendant customers upon Plaintiff's leaving the company. *Id.* Masenzani also directed Plaintiff to attend meetings in Milan and to attend trade shows." (ECF No. 45, at 3) (citing ECF No. 45-2, at 1).
- "Defendant was controlled not by Novebaci . . . but by operators such as Federici, Mazenzni and Caputo." Federici, Mazenzni and Caputo controlled Plaintiff's work . . . They controlled all of the entities . . . These persons controlled Plaintiff's daily work." (ECF No. 45, at 14).
- "Novebaci did not do substantive work for Defendant. [ECF No. 24] ¶ 7.  He created the presence of Defendant in the United States and paid some expenses." (ECF No. 45, at 6) (citing ECF No. 45-4, at 2).
- "Novebaci was not an employee of Defendant, but merely provided a United States address and did bookkeeping . . . Novebaci's business is in being the United States presence for numerous Italian companies, although it is just an administrative function." (ECF No. 45, at 9).
- "[T]he Italian entities fully financed Defendant's operations, paying for all materials and equipment of Defendant[.]" (ECF No. 45, at 16).
- Plaintiff did not report her hours to N&TS Group or Mr. Novebaci.  (ECF Nos. 42-4, at 107 & 42-7, at 71, 85, 107).
- Plaintiff asserts that the ledger shows N&TS Group paid her reimbursements, but she concedes that in truth, it was N&TS SPA funding such reimbursements. (ECF No. 45, at 13).
- "Novebaci only performed administrative duties such as paying bills." (ECF No. 45, at 17).

Thus, the fourth factor weighs against finding a joint employment relationship.

The fifth factor is control over the location of the employee's work. Plaintiff argues that this factor weighs in her favor because her "work was performed at an office space leased by [N&TS Group]." (ECF No. 45, at 10) (citing ECF No. 45-7). This statement, without qualification, is misleading. While the record contains a copy of a "virtual office agreement" executed between Regus and N&TS Group, the plain terms of the agreement make clear that the contract primarily entitled N&TS Group to utilize personalized call answering service and to receive mail and faxes at a designated location. In addition, the agreement entitled N&TS Group to "2 days of private office usage per month at the designated Center and a lobby directory listing, subject to availability." (ECF No. 45-7). Access to an unassigned private office two days per month is a far cry from establishing that N&TS Group controlled Plaintiff's work location. To the contrary, Plaintiff testified that she primarily worked out of a home-office at her residence, (ECF No. 42-2, at 51), and her tax returns show that she took a deduction for doing so. (ECF No. 42-17). Thus, the fifth factor also cuts against finding a joint-employer relationship.

The sixth and final factor, shared control over the ordinary functions of an employer, also leans against finding that a joint-

16

employer relationship exists.  Plaintiff testified she submitted her pay requests to Ms. Federici, CFO of N&TS, who made all payroll decisions, (ECF 45-1, at 2-3), and that she used her own computer and supplies.  (ECF No. 42-4, at 51).  While N&TS Group paid for minor expenses, such as Plaintiff's business card and cell phone, Plaintiff concedes that such expenses were ultimately paid by N&TS SPA, which funded N&TS Group.  Plaintiff also testified that her paychecks were paid by N&TS SPA out of their bank account in Italy.

In sum, even though a single factor may be sufficient to support a finding of joint employment, in this case, Plaintiff has failed to adduce evidence that anyone at N&TS Group performed anything beyond a few, ministerial tasks in relation to her work. She has failed to generate a material dispute that N&TS Group exercised shared control or responsibility over the "essential terms and conditions of the [her] employment" such that it could be considered a joint employer with N&TS SPA.  *Hall*, 846 F.3d at 769.  Plaintiff's argument that whenever the Italian individuals (Federici/Masenzani/Caputo) acted, they acted not on behalf of N&TS SPA, but on behalf of N&TS Group, rests on nothing but unsupported speculation.  Ms. Caputo was not affiliated with N&TS Group and the evidence shows that Mr. Masanzani and Ms. Federici were acting on behalf of N&TS SPA in their dealings with Plaintiff. Because no genuine dispute exists that Defendant and N&TS SPA were

17

joint-employers, Plaintiff cannot overcome Defendant's motion for summary judgment based on this theory of liability.

### 3.   Single-Employer Enterprise Liability

Plaintiff next argues that N&TS Group is liable because together with N&TS SPA and APS, it constitutes a single employer enterprise.  Plaintiff cites to only two cases in which the single-enterprise theory of liability has been applied, both of which are non-binding authority.[9]  Neither of the two cases cited involve FLSA, MWHL, or MWPCL claims.  This is unsurprising as the doctrine typically arises in Title VII cases.  Because Plaintiff has not demonstrated the doctrine's applicability in this case, it has no place in this court's current analysis.  Courts in this district have previously come to the same conclusion when asked to apply the single enterprise theory of liability in the FLSA context:

> None of the[] cases [cited by plaintiffs involving the single-enterprise theory] interpret[] the FLSA, and Plaintiffs are incorrect to argue that what is good for the Title VII goose is good for the FLSA gander. *See Arculeo v. On-Site*, 425 F.3d 193, 197 (2d Cir. 2005) ('Notwithstanding the same label and some core similarities between [single integrated employer and joint employer], the doctrines might differ significantly in different contexts.').

---

[9] *See Murray v. Miner*, 74 F.3d 402 (2d Cir. 1996); *Las Palmas Associates v. Las Palmas Center Associates*, 235 Cal.App.3d 1220 (1991).

*Roman v. Guapos III, Inc.*, 970 F. Supp. 2d 407, 414 (D.Md. 2013).
Thus, Plaintiff's attempt to hold Defendant liable for violations
of the FLSA, MWHL, and MWPCL under the single-employer enterprise
theory is unsuccessful.

### 4. Successor Liability

Finally, Plaintiff attempts to hold N&TS Group liable for
alleged wage and overtime violations based on the theory that it
was a successor to APS.[10]

> Maryland Corps. & Ass'ns Code Ann. § 1-
> 101(u)(4) (1975, 1985 Repl.Vol.), defines a
> successor corporation as a vendee, lessee or
> other transferee in a transfer of assets. A
> transfer of assets is any sale, lease,
> exchange or other transfer of all or
> substantially all of the assets of a
> corporation. § 1-101(v).
> . . . .
> The general rule of corporate liability is
> that, ordinarily, a corporation which acquires
> the assets of another corporation is not
> liable for the debts and liabilities of the
> predecessor corporation. There are, however,
> four exceptions to this general rule. The
> debts and liabilities of the predecessor
> corporation are imposed on the successor
> corporation when (1) there is an expressed or
> implied assumption of liability; (2) the
> transaction amounts to a consolidation or

---

[10] Plaintiff raises the notion of successor liability in a
mere two sentences located in the fact section of her opposition
brief but then makes no mention of successor liability it in her
analysis. (*See generally* ECF No. 45). Given such short shrift,
the court struggles in construing Plaintiff's arguments regarding
successor liability. First, if Defendant was shown to be APS's
successor, it would be liable only for violations committed by
APS, yet Plaintiff does not explicitly allege any wrongdoing by
APS. Second, Plaintiff does not allege which of the four theories
of successor liability she believes applies.

> merger; (3) the purchasing corporation is a
> mere continuation of the selling corporation;
> or (4) the transaction is entered into
> fraudulently to escape liability for debts.
> *Golden State Bottling Co. v. National Labor
> Relations Board*, 414 U.S. 168, 182–83 n. 5, 94
> S.Ct. 414, 424 n. 5, 38 L.Ed.2d 388 (1973).

*Balt. Luggage Co. v. Holtzman*, 80 Md. App. 282, 290 (1989).  Here, Plaintiff does not specify which of the four exceptions she believes applies, but the court presumes that she relies on the third exception based on the assertions in Plaintiff's opposition brief.  Specifically, Plaintiff states that "an APS/Defendant joint ledger demonstrates that it was one continuous entity" and that "although the existence of APS and Defendant overlapped, N&TS [SPA] intended to have Defendant take the place of APS."  (ECF No. 45, at 11).  Plaintiff, however, points to no evidence whatsoever that there was "any sale, lease, exchange or other transfer of all or substantially all of [APS's] assets" to N&TS Group.  Plaintiff relies solely on two pieces of evidence to support her theory of successor liability: (1) a statement made by Mr. Novebaci during his deposition and (2) a general accounting ledger.  (ECF No. 45, at 11).  Neither of these pieces of evidence show what Plaintiff says they do.  As Defendant correctly points out, Plaintiff misquotes Mr. Novebaci's testimony.  He did *not* testify that N&TS SPA intended for N&TS Group to replace APS after it was wound down.  To the contrary, Mr. Novebaci testified that N&TS Group came into existence prior to APS's dissolution and that "there is no

relationship between APS or N[&]TS Group Corporation[.]" (ECF No. 45-5, at 26-27).   Likewise, nothing in the "joint ledger" would allow one to conclude that it was, indeed, a "joint" document.   To the contrary, the ledger is titled "N&TS Group Corporation General Ledger" and each page contains a footer titled "N&TS Group Corp." (ECF No. 45-3).   There is no reference to APS in any of the ledger's fourteen pages.  When asked about the ledger, Mr. Novebaci testified that he believed it was N&TS Group's Ledger, not APS's ledger.   (ECF No. 45-2, at 93-94).   For all of these reasons, Plaintiff falls short of creating a genuine dispute that N&TS Group was a successor to APS.   Thus, Plaintiff's argument that N&TS Group can be held liable under a theory of successor liability fails.

Plaintiff has failed to show, under any of the asserted theories, that a genuine dispute of fact exists as to whether or not Defendant was her employer.  Accordingly, Defendant is entitled to summary judgment on all of Plaintiff's statutory claims (Counts I, II, and IV).[11]   The only remaining claim left for the court to analyze is Plaintiff's breach of contract claim in Count III.

---

[11] While the court's analysis focused largely on Plaintiff's FLSA claim, the same analysis applies to Plaintiff's MWHL and MWPCL claims, as both require a finding that Defendant was Plaintiff's employer as a pre-requisite to liability.

### B.   Breach of Contract

In Count III of her third amended complaint, Plaintiff alleges that she "entered into a contract with N&TS [Group][12] for her labor and services for translation work[,]" that she "fully performed her obligations under the Translation Contract and satisfied all conditions of the Translation Contract[,]" and that Defendant, in bad faith, refused to pay her for work done pursuant to this translation contract.  (ECF No. 24, at 8).  To the extent that the court found Plaintiff had a translation contract with N&TS SPA, she further contends that N&TS Group is liable under the joint-employer or single-enterprise employer theories.

The only two contracts that exist in the record are: (1) a contract between Plaintiff's corporation (Viral Storytelling) and APS and (2) a contract between Plaintiff's corporation and N&TS SPA.  She points to absolutely no evidence of any kind supporting that a separate contract for translation work exists.  Plaintiff clarifies in her opposition that no *written* contract exists for the translation services, and, when asked in her deposition, "what

---

[12] Plaintiff asserts in her amended complaint that the contract is with N&TS Group, yet, states in her opposition that "to the extent that the [c]ourt finds it was N&TS Group SPA entering into a translation contract, Defendant is a joint employer with APS and N&TS Group Spa, and, as such, has contractual liability.  Defendant is part of a single employment enterprise, and therefore, is a contracting party.  Additionally, Novebaci admitted that Defendant is a successor to APS, again, making Defendant subject to the terms of the contract."  (ECF No. 45, at 18).

is the translation contract" referred to in Count III, Plaintiff responded, that "[t]here was no specific translation contract." (ECF No. 45-1, at 81-82).  Plaintiff has failed to identify a specific contract to which N&TS Group was itself a party.  Without a contract, there can be no breach of contract.  (*Kantsevoy v. LumenR LLC*, 301 F. Supp. 3d 577, 596 (D.Md. 2018) ("Under Maryland law, the elements of a claim for breach of contract are contractual obligation, breach, and damages.  To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation.") (internal citations and quotations omitted).  Even if Plaintiff had pointed to evidence that a contract existed, Plaintiff's assertions seem to suggest that any agreement would have been with N&TS SPA, not N&TS Group.  (ECF No. 45, at 5) ("Defendant, through Masenzani and Caputo, requested that Plaintiff perform this translation work. Caputo provided to Plaintiff the specific Italian documents that Plaintiff was to translate into English.").  As discussed previously, however, Plaintiff's theories for holding N&TS Group liable for the actions of N&TS SPA (joint employer liability, single enterprise liability, and successor liability) are unavailing.  Accordingly, Defendant is also entitled to summary judgment on Plaintiff's breach of contract claim in Count III.

## V.   Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendant will be granted.   A separate order will follow.

<u>                              /s/                              </u>
DEBORAH K. CHASANOW
United States District Judge